IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMCAST CABLE COMMUNICATIONS, LLC (1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania) | :: :: :: :: | CIVIL ACTION |
| Plaintiff, | :: :: | **(JURY TRIAL DEMANDED)** |
| v. | :: :: :: | |
| ROBERT ALAN ORLOWSKI (7090 E. Hinsdale Place, Centennial, Colorado), THOMAS ALVIN TAYLOR (9860 S. Burberry Way, Highlands Ranch, Colorado) and TUNING ANALYTICS LLC (7090 E. Hinsdale Place, Centennial, Colorado), | :: :: :: :: | |
| Defendants. | | |

## COMPLAINT

Plaintiff Comcast Cable Communications, LLC ("Comcast"), by its attorneys, as and for its Complaint against Defendants Robert Alan Orlowski, Tuning Analytics LLC, and Thomas Alvin Taylor (collectively "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      For nearly a year, Comcast employee Robert Orlowski repeatedly pressed his supervisors to sign a multimillion dollar software license agreement with Tuning Analytics LLC, rather than have Mr. Orlowski develop comparable software, a second time, within his responsibilities at Comcast.  Unbeknownst to Comcast, Mr. Orlowski did not serendipitously meet Tuning Analytics at an industry conference, as he had described.  Mr. Orlowski created Tuning Analytics.  And Tuning Analytics had one purpose: to promote and sell software that Mr. Orlowski had already developed within the scope of his employment at Comcast (but for the improper benefit of Defendants).  To conceal his true involvement with Tuning Analytics, Mr.

Orlowski installed his friend, Thomas Taylor, as Manager of the company, paid Mr. Taylor out of his own pocket, and pretended to be a stranger to both Tuning Analytics and Mr. Taylor while advocating on their behalf as they sought to negotiate with Comcast.  Mr. Orlowski's scheme came to light when Comcast learned that Mr. Orlowski had secretly filed for and obtained related patents in his own name for inventions that Mr. Orlowski had been instructed by Comcast to develop years earlier for Comcast.  Comcast seeks a declaration that it owns the patents, pending patent applications, and software developed by Mr. Orlowski during his employment with Comcast.  Comcast also seeks monetary and injunctive relief for Defendants' conspiracy and fraud, and for Mr. Orlowski's breach of his fiduciary duty and contractual employment obligations to Comcast.

## PARTIES

2.     Plaintiff Comcast Cable Communications, LLC ("Comcast") is a Delaware limited liability company with its principal place of business at 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103.  Comcast is the largest cable company in the United States and is a leading provider of cable, high speed internet, and telephone service to residential and business customers.

3.     Mr. Orlowski resides at 7090 E. Hinsdale Place, Centennial, Colorado.

4.     Defendant Tuning Analytics LLC ("Tuning Analytics") is a Colorado limited liability company with its current principal place of business at 7090 E. Hinsdale Place, Centennial, Colorado.  Thomas Alvin Taylor ("Mr. Taylor") is the Manager of Tuning Analytics and, upon information and belief, resides at 9860 S. Burberry Way, Highlands Ranch, Colorado.

5.     On September 16, 2013, Mr. Orlowski filed documents with the Colorado Secretary of State changing the Registered Agent for Tuning Analytics from Mr. Taylor to Mr. Orlowski and changing Tuning Analytics' principal place of business from 9860 S. Burberry

2

Way, Highlands Ranch, Colorado (Mr. Taylor's residence) to Mr. Orlowski's residence at 7090

E. Hinsdale Place, Centennial, Colorado.

6.      Mr. Orlowski and Mr. Taylor are friends.

7.      Mr. Orlowski paid Mr. Taylor to manage Tuning Analytics.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331,

1332, and 1338, and pursuant to the doctrine of supplemental jurisdiction.

9.      This Court has personal jurisdiction over Mr. Orlowski and his co-

conspirators Tuning Analytics and Mr. Taylor, because each of them conducted business

transactions and communications with Comcast and its affiliates in Pennsylvania, giving rise to

the claims asserted herein.  Additionally, this Court has personal jurisdiction over Defendants

because each of them directed tortious conduct to the Commonwealth of Pennsylvania by,

among other things, conspiring with each other to fraudulently induce Comcast to pay Tuning

Analytics millions of dollars in licensing fees for software that Comcast, and not Tuning

Analytics, owns.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## FACTS COMMON TO ALL COUNTS

11.     In June 2013, another company involved in the television industry made a

startling revelation to Comcast.  A Comcast employee, Mr. Orlowski, while working on matters

assigned to him by Comcast, had informed the company that he owned patents in his own name

for technology related to the company's business and, in a veiled threat of patent infringement,

encouraged the company to work with Tuning Analytics to develop its products.  Comcast

immediately began an investigation.

3

**Mr. Orlowski Learns How to Model Set-Top Box Data at Comcast**

12.     Mr. Orlowski began his employment with Comcast in July 2007.  At the beginning of his employment, Mr. Orlowski entered into a confidentiality agreement in which Mr. Orlowski agreed "to maintain the confidentiality of all Confidential Information," "not to disclose any Confidential Information to any third party," and not to use "any Confidential Information for any personal reasons."  A copy of Mr. Orlowski's confidentiality agreement is attached as Exhibit A.

13.     Comcast initially hired Mr. Orlowski as a data modeler.  One of the jobs of a data modeler at Comcast is to determine the best way to efficiently store any data that Comcast needs for its business, consistent with applicable laws and Comcast's customer privacy policy.  One purpose for which Comcast can use such data is to learn how Comcast subscribers use or interact with Comcast products and services in a non-personally identifiable way.

14.     Early on in Mr. Orlowski's tenure with Comcast, he worked on several projects directed to data generated by consumers' interactions with their set-top box.  A set-top box, also known as a digital cable box, connects a subscriber's television to an external signal source, which allows the subscriber to view digital television channels and provides access to other features such as programming guides or user interfaces, video on demand, and pay per view features.  Set-top box data includes data generated by the device itself, the programs on it, and the network it is connected to, as well as data reflecting how, in a non-personally identifiable way, subscribers use and interact with the set-top box and the products and services to which the set-top box provides access.

15.     One example of how Comcast can use set-top box data is to measure advertising and programming viewing over time to determine audience viewership and ratings.

16.     During Mr. Orlowski's employment with Comcast, Comcast sought to develop more advanced set-top box data tools—not only to collect and analyze the set-top box data—but to design a system that presented the analyzed data in a useful format.  Mr. Orlowski was intimately involved in the research, development, and implementation of these tools to collect, analyze, and display set-top box data.

17.     For example, in mid-2007, Mr. Orlowski was assigned by Comcast to work on a project to improve the efficiency of delivering television channels over the network. The project involved assessing viewership of Comcast channels at certain times.  To do so, Comcast, through Mr. Orlowski, devised a system to collect and analyze set-top box channel viewing data over time.

18.     After Mr. Orlowski gained experience modeling set-top box data on the first project described above, Comcast assigned Mr. Orlowski to additional projects involving set-top box data collection and analysis.  For one of these projects, Comcast studied the use of products available through a set-top box by collecting, analyzing and correlating set-top box data.

19.     Mr. Orlowski's work on both of these projects concluded not later than June 2010, when Mr. Orlowski transferred to a new team at Comcast, reported to a new supervisor, and became a data architect.

**Mr. Orlowski Filed Patent Applications for Inventions that Comcast Hired Him to Create**

20.     Through a public records search, Comcast found that Mr. Orlowski had been issued U.S. Patent Nos. 8,365,212 ("the '212 Patent") and 8,365,213 ("the '213 Patent") on January 29, 2013 (attached hereto as Exhibits B and C).  Mr. Orlowski prevented Comcast from learning about the patents until after their issuance by filing a "Nonpublication Request" with the

U.S. Patent Office ("USPTO"), an unusual request in typical patent practice, which prevents a

patent application from being publicly available unless and until a patent is granted on the

application.

21.     The '212 and '213 Patents are generally directed to analyzing human

interactions with electronic devices by, for example, collecting set-top box channel tuning data,

analyzing that data, and reporting that data by way of a useful metric.

22.     The '212 Patent, filed on December 29, 2010, is generally directed to a

computer method for analyzing usage of an electronic device, for example, a set-top box.  The

analysis is based on a review of usage data from the electronic device broken down over time.

The invention includes outputting a graph or metric displaying the results of the analysis.

(Exhibit B, '212 Patent, Claims at 84:26−90:18.)

23.     The '213 Patent, filed on March 18, 2011, is generally directed to a

computer method for analyzing set-top box data related to channel changes over time.  The

invention includes outputting a graph or metric displaying the results of the analysis.  (Exhibit C,

'213 Patent, Claims at 79:24−92:53.)

24.     The subject matter of the '212 and '213 Patents, as described in more detail

in those attached patents, directly relate to, and are based primarily or wholly upon, the work that

Comcast assigned Mr. Orlowski to perform in his role as a data modeler for Comcast, including

his work on the projects described above, as well as other projects that Comcast assigned to Mr.

Orlowski before he filed these patent applications.

25.     Mr. Orlowski filed additional patent applications with the USPTO.  Those

additional patent applications also were filed with Nonpublication requests, solely in Mr.

Orlowski's name, and are currently pending at the USPTO (hereinafter "the Pending Patent

Applications").  The Pending Patent Applications relate to the same subject matter as the '212

and '213 Patents and were filed in or about late 2011.

26.     Notwithstanding that Mr. Orlowski was required by company policy and

by the terms of the confidentiality agreement between him and Comcast (described in paragraphs

95−101 below), to disclose to Comcast any inventions or discoveries that he created during his

employment with Comcast, Mr. Orlowski did not disclose the '212 Patent, the '213 Patent, or the

Pending Patent Applications to Comcast.

**Mr. Orlowski Secretly Created Tuning Analytics to Market and Sell Software that He Created in the Scope of His Employment for Comcast**

27.     After Comcast assigned Mr. Orlowski to the projects described above, Mr.

Orlowski developed software to analyze and report set-top box data (the "TA Software").

28.     Mr. Orlowski used Comcast's confidential and proprietary information,

data, and know-how to develop and test the TA Software.

29.     Although Mr. Orlowski's creation of the software was within the scope of

his employment responsibilities for Comcast, and made use of Comcast's confidential and

proprietary information, data, and knowhow, Mr. Orlowski and the other defendants nonetheless

sought to deprive Comcast of the software and instead benefit themselves.

30.     Instead of disclosing and providing the TA Software to Comcast as he was

required to do under the terms of his employment with Comcast, Mr. Orlowski came up with a

scheme to defraud Comcast into licensing the software for a substantial fee.

31.     First, on information and belief, Mr. Orlowski, either alone or with Mr.

Taylor, caused the domain name "tuninganalytics.com" to be privately registered using the

DomainsByProxy private registration service.  The purpose of the DomainsByProxy service is to

conceal the identity of the true registrant of a domain name from the public.  The domain, registered on March 19, 2012, is the address of the Tuning Analytics website.

32.     Next, three days later, on information and belief, Mr. Orlowski caused the registration of Tuning Analytics LLC as a Colorado limited liability company and named Mr. Taylor the Manager of and registered agent for Tuning Analytics.

33.     Mr. Orlowski named Mr. Taylor the Manager of Tuning Analytics to conceal Mr. Orlowski's true role in and relationship with Tuning Analytics.

34.     On information and belief, Defendants created the Tuning Analytics website to promote the TA Software.  Tuning Analytics boasts on its website that the TA Software analyzes and reports set-top box data over time.  Tuning Analytics further boasts that its software allows cable companies to determine which channels are being watched and when they are being watched, thereby enabling cable companies to measure both advertising viewership and viewership of its channels.

35.     With Tuning Analytics now established and Mr. Orlowski's relationship to the company and its genesis hidden, Defendants embarked on an aggressive strategy to utilize Tuning Analytics to license the TA Software to Comcast for millions of dollars under false pretenses.

**Mr. Orlowski Signs Trial License Agreements Without Authorization**

36.     In or about March or April 2012, Mr. Orlowski falsely told his supervisor at Comcast that he had met Tuning Analytics at an industry show in Denver, Colorado, and that he wanted to do a trial of its software.

37.     On April 2, 2012, less than two weeks after Tuning Analytics was registered with the Colorado Secretary of State, Mr. Orlowski signed a trial license agreement for

the Tuning Analytics software on Comcast's purported behalf.  Mr. Orlowski knew that he was required to, but did not, obtain company authorization before entering into the trial license agreement.  Mr. Orlowski was further required to disclose his conflict of interest and the genesis of the TA Software to Comcast but never did so.

38.     Mr. Orlowski also signed on Comcast's purported behalf, again without authorization, two additional trial license agreements with Tuning Analytics, dated October 9, 2012 and January 14, 2013.

39.     Mr. Orlowski later signed, without authorization, multiple extensions of the April 2, 2012 trial license agreement on Comcast's purported behalf, and likewise signed, again without authorization, an extension of the October 9, 2012 trial license on Comcast's purported behalf.

40.     Mr. Taylor countersigned all of the purported trial license agreements on behalf of Tuning Analytics, without ever disclosing his conflict of interest or the genesis of the TA Software.

41.     On information and belief, the trial license agreements for the TA Software were highly valuable to Defendants because it enabled Mr. Orlowski to test the software at Comcast for over one year using Comcast's resources, including its confidential set-top box data and information and know-how, and to further refine and develop the TA Software in response to the year-long testing.  Mr. Orlowski conducted all of this testing while concealing his relationship with Tuning Analytics and the genesis of the TA Software from Comcast in order to improve the TA Software using Comcast's data so that he, Mr. Taylor, and Tuning Analytics could try to license the software to Comcast and others for significant sums of money.

42.     The trial license agreements were additionally of great value to Defendants in marketing the TA Software to potential customers because, as Tuning Analytics touted on its website, the TA Software had been "thoroughly evaluated at a major United States Cable Operator where we successfully processed daily channel tuning data for 90 days."

**Mr. Orlowski Aggressively and Falsely Markets the TA Software Within Comcast**

43.     On July 11, 2012, Mr. Orlowski e-mailed two Comcast executives, both of whom are located in Philadelphia, extolling the virtues of the TA Software and strongly promoting why Comcast should license the software from Tuning Analytics.  Mr. Orlowski described the TA Software as providing "immediate value" and "no risk of failure."  He explained that a price quote from Tuning Analytics should be emailed that day.

44.     Later on July 11, 2012, Mr. Taylor sent a letter to the same two Comcast executives at their Philadelphia address attaching a draft Memorandum of Understanding and Agreement, including a price quote for the TA Software.  Tuning Analytics falsely stated that it was the owner of the TA Software and offered Comcast a license to the software for a term of six years at a total cost of $12,500,000.

45.     Comcast did not agree to license the TA Software at the $12,500,000 price.  As a result, Mr. Taylor sent another letter to the same two Comcast executives at their Philadelphia address on August 16, 2012, offering a more limited license to the TA Software for an annual license fee of $225,000.  Tuning Analytics again falsely stated that it was the owner of the TA Software.

46.     Comcast did not agree to the more limited license that Tuning Analytics proposed.  Instead, Comcast internally discussed developing its own software to analyze set-top box data to achieve the same or better results than the TA Software did.  Mr. Orlowski was

involved in those discussions, yet he remained a strong advocate for signing the long-term licensing agreement with Tuning Analytics for the TA Software, and repeatedly rebuffed suggestions that Comcast develop similar software internally.

47.    On or about November 7, 2012, Mr. Orlowski delivered a presentation to Comcast and employees of its affiliate NBCUniversal about the TA Software that he had been testing at Comcast using Comcast set-top box data.

48.    Mr. Orlowski prepared a slide deck for the presentation.  Knowing the importance of set-top box data analytics to Comcast and its business, Mr. Orlowski marked every slide "Proprietary and Confidential" except for his title slide.

49.    Mr. Orlowski devoted a slide of his presentation to the purported corporate structure of Tuning Analytics, LLC, describing it as a small privately held company in Colorado managed by "Thomas Taylor locally" with European management company, Claystone GMBH, providing "expert advice and business guidance."

50.    In his presentation, Mr. Orlowski did not disclose his role in Tuning Analytics or his role as the developer of the TA Software, notwithstanding that Comcast's Conflict of Interest Policy mandated such disclosures.

51.    The day after Mr. Orlowski's presentation, one of the Comcast executives who had received the software license proposals from Tuning Analytics told Mr. Orlowski that his constant focus on the TA Software was not in Comcast's business interests and that he needed to refocus his efforts on supporting Comcast.

52.    Despite receiving this admonishment, Mr. Orlowski's resolute focus on having Comcast license the TA Software continued.  In April 2013, Mr. Orlowski's supervisor e-mailed Mr. Orlowski telling him that they needed to start talking about the alternative plan to

build software to perform the same functions as the TA Software and asked Mr. Orlowski to lead

the development effort, unaware of his relationship to Tuning Analytics or that he had already

developed the TA Software (within the scope of his employment at Comcast but for the improper

benefit of Defendants).

53.     Mr. Orlowski responded by refusing to build the software in-house at

Comcast based on purported concerns about intellectual property infringement and again pushed

Comcast to license the TA Software:  "If I were to try to build the equivalent or even lead the

effort, there is a strong possibility of copyright infringement.  We do not want to go there.  A

safer approach is to license the software . . . ."

54.     On May 16, 2013, Mr. Orlowski again approached his supervisor about

licensing the TA Software.  Mr. Orlowski continued to falsely represent via email that he could

not reproduce what the TA Software does "for both copyright and difficulty reasons."  Mr.

Orlowski stated his intention to instead obtain a price quote for the TA Software.

55.     That same day, Mr. Taylor sent a letter to Mr. Orlowski's supervisor, as

well as a second Comcast executive at his Philadelphia address, with a new proposed

Memorandum of Understanding and Agreement, and a price quote for the TA Software.  Tuning

Analytics again falsely stated that it was the owner of the TA Software and offered Comcast a

license for an annual fee of $3,450,000.

56.     Three weeks later, Comcast received the startling revelation about the

conduct of its employee, Mr. Orlowski, from the unaffiliated television industry company, and

Comcast began its investigation.

57.     On September 16, 2013, after Comcast informed Mr. Orlowski of its

understanding of his activities, Tuning Analytics filed with the State of Colorado to change its

Registered Agent from Mr. Taylor to Mr. Orlowski, and to change its principal place of business from Mr. Taylor's home address, to Mr. Orlowski's home address.

**COUNT I**

**DECLARATORY JUDGMENT FOR OWNERSHIP OF
ISSUED PATENTS AND PENDING PATENT APPLICATIONS
(MR. ORLOWSKI)**

58.    Comcast hereby incorporates by reference paragraphs 1 through 57 of its Complaint as though fully set forth herein.

59.    Comcast is the exclusive owner of the '212 and '213 Patents because Comcast employed Mr. Orlowski to invent the inventions described and claimed in the '212 and '213 Patents.

60.    Comcast is the exclusive owner of the Pending Patent Applications because Comcast employed Mr. Orlowski to invent the inventions of the Pending Patent Applications.

61.    Comcast has repeatedly advised Mr. Orlowski that it believes the '212 and '213 Patents and the Pending Patent Applications are Comcast property, and Mr. Orlowski has repeatedly denied they are Comcast property and claimed ownership himself.

62.    After Comcast confronted Mr. Orlowski about what it had learned, Mr. Orlowski again claimed to own the '212 and '213 Patents and the Pending Patent Applications and threatened to sell them to a third party if Comcast did not buy or license them from him.

63.    In accordance with Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, there is an existing case or controversy between the parties, and Comcast seeks a declaration that it is the owner of the '212 and '213 Patents and the Pending Patent Applications.

13

<u>**COUNT II**</u>

**DECLARATORY JUDGMENT FOR OWNERSHIP**
<u>**OF THE COPYRIGHT TO THE TA SOFTWARE**</u>
**(ALL DEFENDANTS)**

64.     Comcast hereby incorporates by reference paragraphs 1 through 63 of its
Complaint as though fully set forth herein.

65.     Comcast is the exclusive copyright owner of the TA Software by virtue of
the work made for hire doctrine because Mr. Orlowski developed and tested the TA Software
within the scope of his employment for Comcast.

66.     Defendants have falsely represented to Comcast and, on information and
belief, have and continue to falsely represent to others that Tuning Analytics is the copyright
owner of the TA Software in an attempt to secure lucrative software licenses for the TA
Software.

67.     Comcast has repeatedly requested that Mr. Orlowski deliver the TA
Software and the source code for the TA Software to Comcast but Mr. Orlowski has refused to
do so.

68.     Comcast has repeatedly advised Mr. Orlowski and Tuning Analytics that
Comcast believes the TA Software is Comcast property, and Mr. Orlowski and Tuning Analytics
have repeatedly denied the TA Software is Comcast property and have claimed ownership
themselves.

69.     In accordance with Federal Rule of Civil Procedure 57 and 28 U.S.C. §§
2201 and 2202, there is an existing case or controversy between the parties, and Comcast seeks a
declaration that it is the exclusive owner of the copyright in and to the TA Software pursuant to
the Copyright Act, 17 U.S.C. § 201.

## COUNT III

## FRAUD
## (ALL DEFENDANTS)

70.     Comcast hereby incorporates by reference paragraphs 1 through 69 of its Complaint as though fully set forth herein.

71.     Mr. Orlowski had a duty to disclose material information to his employer Comcast, including his preparation and filing of the '212 and '213 Patents, the Pending Patent Applications, his development of the TA Software, and his competitive activities at Tuning Analytics.

72.     Mr. Orlowski intentionally concealed from Comcast his preparation and filing of the '212 and '213 Patents, the Pending Patent Applications, his development of the TA Software, and his competitive activities at Tuning Analytics.

73.     Mr. Taylor and Tuning Analytics intentionally and falsely represented to Comcast in communications dated July 11, 2012, August 26, 2012, and May 16, 2013 that Tuning Analytics owned the TA Software to procure a lucrative license from Comcast for the software.

74.     Mr. Orlowski intentionally and falsely represented to Comcast in multiple written communications and in his November 7, 2012 presentation to Comcast that Tuning Analytics owned the TA Software.

75.     Mr. Orlowski intentionally and falsely represented to Comcast that he met Tuning Analytics at a Cable Labs show to mislead Comcast about his financial interest in and competitive activities with Tuning Analytics.

76.     Mr. Orlowski intentionally and falsely represented to Comcast both orally and in written communications, including in an e-mail dated May 16, 2013, that he could not

develop software that performed the same functions as the TA Software because it would be too difficult for him to do so.

77.     Defendants made the foregoing and other intentional misrepresentations and material omissions, which Defendants intended for Comcast to rely on, so that Defendants could obtain and use Comcast's financial resources, confidential set-top box data, information, and know-how to develop, refine, test and market the TA Software.

78.     Defendants additionally made the foregoing and other intentional misrepresentations and material omissions, which Defendants intended for Comcast to rely on, to deceive Comcast into licensing software from Tuning Analytics for millions of dollars even though Comcast owns the software.

79.     Defendants additionally made the foregoing and other intentional misrepresentations and material omissions, which Defendants intended for Comcast to rely on, to deceive Comcast into licensing software from Tuning Analytics for millions of dollars instead of having Mr. Orlowski develop additional software for Comcast.

80.     Comcast justifiably relied on Defendants' intentional misrepresentations and material omissions resulting in financial damage to Comcast, including the loss and diversion of company time and resources on testing and vetting the TA Software, the lost opportunity to custom build similar software to Comcast's specifications, the lost opportunity to use the TA Software for Comcast's business, the lost opportunity to license the TA Software to third parties, as well as the salary and benefits that Comcast paid to Mr. Orlowski during his fraudulent conduct and during the company's investigation of his wrongdoing.

81.     Defendants knowingly, willfully, and maliciously committed the foregoing acts.

82.     As a direct and proximate result of Defendants' intentional misrepresentations and material omissions, Comcast has been damaged in an amount exceeding $75,000.

## COUNT IV

### CIVIL CONSPIRACY
### (ALL DEFENDANTS)

83.     Comcast hereby incorporates by reference paragraphs 1 through 82 of its Complaint as though fully set forth herein.

84.     Defendants acted with a common purpose to commit fraud, an unlawful act, upon Comcast.

85.     Defendants knowingly, willfully and maliciously committed overt acts in furtherance of the common purpose, as described herein.

86.     As a direct and proximate result of Defendants' civil conspiracy to commit fraud, Comcast has been damaged in an amount exceeding $75,000.

## COUNT V

### BREACH OF FIDUCIARY DUTY
### (MR. ORLOWSKI)

87.     Comcast hereby incorporates by reference paragraphs 1 through 86 of its Complaint as though fully set forth herein.

88.     Mr. Orlowski owed fiduciary duties to his employer Comcast.

89.     Mr. Orlowski breached his duties of loyalty and good faith to Comcast by intentionally concealing from Comcast his preparation and filing of the '212 and '213 Patents, the Pending Patent Applications, his development of the TA Software, and his competitive activities with Tuning Analytics.

90.     Mr. Orlowski further breached his duties of loyalty and good faith to Comcast by falsely stating that he could not develop software for Comcast to perform the same functions as the TA Software.

91.     Mr. Orlowski further breached his duties of loyalty and good faith to Comcast by obtaining and using Comcast's financial resources, confidential set-top box data, information, and know-how to develop, refine, test and market the TA Software for his own personal gain, software that Defendants improperly contend is owned by Tuning Analytics.

92.     Mr. Orlowski further breached his duties of loyalty and good faith to Comcast by conspiring with Tuning Analytics and Mr. Taylor to deceive Comcast into licensing software from Tuning Analytics for millions of dollars even though Comcast owns the software.

93.     Mr. Orlowski knowingly, willfully, and maliciously committed the foregoing acts.

94.     As a direct and proximate result of Mr. Orlowski's breaches of fiduciary duty, Comcast has suffered and will continue to suffer damages in an amount exceeding $75,000.

### COUNT VI

### BREACH OF CONTRACT
### (MR. ORLOWSKI)

95.     Comcast hereby incorporates by reference paragraphs 1 through 94 of its Complaint as though fully set forth herein.

96.     In connection with his employment at Comcast, Mr. Orlowski entered into a confidentiality agreement with Comcast, a copy of which is attached as Exhibit A.

97.     Therein, Mr. Orlowski undertook contractual duties "to maintain the confidentiality of all Confidential Information," "not to disclose any Confidential Information to any third party," and not to use "any Confidential Information for any personal reasons."

98.    By wrongfully acquiring, using, and disclosing Comcast's Confidential Information and know-how and other confidential and proprietary information to Mr. Taylor and Tuning Analytics, Mr. Orlowski breached his contractual obligations under the confidentiality agreement.

99.    In addition, Mr. Orlowski further violated his contractual duties to Comcast under the confidentiality agreement by failing to safeguard Comcast's intellectual property and by failing and subsequently refusing to assign the inventions contained in the '212 and '213 Patents and the Pending Patent Applications to Comcast.

100.    Mr. Orlowski further violated his contractual duties to Comcast under the confidentiality agreement by using Comcast's Confidential Information on his own behalf and on behalf of others during and after his employment.

101.    As a direct and proximate result of the foregoing breaches of contract, Comcast has suffered and will continue to suffer damages in an amount exceeding $75,000.

## PRAYER FOR RELIEF

WHEREFORE, Comcast prays for judgment against Defendants as follows:

A.      A declaration that Comcast is the true and correct owner of all right, title and interest in, to and under the '212 and '213 Patents and the Pending Patent Applications;

B.      An order requiring Defendants to:  (i) provide all reasonable assistance and to execute all documents necessary to confirm title to the '212 and '213 Patents and the Pending Patent Applications in Comcast; and (ii) correct the records at the USPTO;

C.      A declaration that Comcast is the true and rightful owner of the copyright of the TA Software and holder of all rights and interests related to the TA Software;

D.      An order requiring Defendants to deliver the TA Software, all documentation for the software, all source code for the software, and all development notes and files for the software to Comcast (the "TA Software Materials").

E.      An order for the destruction of any remaining copies of the TA Software Materials in Defendants' possession, custody or control.

F.      An award to Plaintiff of:

    i.      Compensatory damages in an amount to be proven at trial;

    ii.      All gains, profits and advantages derived from Defendants' wrongful acts;

    iii.      Punitive damages;

    iv.      The costs and disbursements of this action;

    v.      Reasonable attorneys' fees; and

    vi.      Such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Comcast demands a trial by jury on all issues so triable.

**BALLARD SPAHR LLP**

Stephen J. Kastenberg
Hara K. Jacobs
I.D. Nos.:  70919, 74832

1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel: (215) 665-8500
Fax: (215) 864-9999
E-mail:  kastenberg@ballardspahr.com
            jacobsh@ballardspahr.com

*Attorneys for Plaintiff*
*Comcast Cable Communications, LLC*

Dated:  November 6, 2013